**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

In re:
Khader Kamal Azzouz and Nanette Azzouz      Case No. 15-12559-KHK
    Debtors                                                              (Chapter 11)


Khader Azzouz, et al.,
    Plaintiffs
v.                                                                              Adv. Proc. No. 16-1117-KHK

Annab, Inc., Inc.
    Defendant

## MEMORANDUM OPINION

The matter before the Court involves a contract dispute between Khader and Nanette Azzouz, former owners of Bagels and Beyond, LLC and Mansour and Samar Annab, former owners of Annab Inc. d/b/a Bagel Bagel. The Court must determine which party breached the contract and the amount of damages the prevailing party is entitled to receive.

I.    BACKGROUND

On April 4, 2014, debtors Khader and Nanette Azzouz ("Plaintiff")[1], entered into an Asset Purchase Agreement ("Agreement") to buy a bagel business for $575,000 from Annab, Inc. ("Defendant"), a corporation owned by Khader Azzouz's sister, Samar Annab and her husband, Mansour.[2] That same day, the parties also endorsed a Deed of Lease that provided the Plaintiff would pay the Defendant $5,750 per month to lease the property where the business was located and pay $780 per month to cover the cost of the condominium fee on the property. At closing, the

---

[1] Although Nanette Azzouz is also a Defendant in this matter, she did not participate in this adversary proceeding and has not testified before this Court. Accordingly, although this action involves joint debtors as Plaintiff, the opinion will refer to a singular Defendant for purposes of readability.

[2] Mansour Annab stopped working full time in the business for health reasons in 2012. After that, Samar Annab assumed control of the day to day operations. 2017 Tr. 215:16-25.

1

Plaintiff paid the Defendant $70,000 in cash and signed a promissory note for the remaining balance of $485,000 made payable to the Defendant. The Plaintiff received $20,000 in sales commissions at settlement.

The Plaintiff assumed control of the business on April 6, 2014, and for reasons discussed below he attempted to rescind the Agreement on July 15, 2014. The Defendant refused to honor the rescission. While the parties were trying to resolve their differences, the Plaintiff continued to operate his bakery, but finally abandoned it and turned the keys over to the attorney for the Defendant on October 15, 2014.

State litigation ensued over the failed business transfer with both parties contending the other breached the Agreement. The Plaintiff then filed for bankruptcy and filed this adversary proceeding for breach of contract by the Defendant to recover his deposit and other damages. The Defendant filed a claim in the bankruptcy case for the damages it suffered when the Plaintiff breached the Agreement and the Plaintiff is objecting to the claim as part of this proceeding. This Court denied both parties' requested relief and both sides appealed.

The matter was remanded to this Court to make a specific finding of fact on whether the Plaintiff knew the actual labor costs of running the bagel business before executing the contract. Order, *Khader Azzouz, et. al. v. Annab, Inc., et. al.,* No. 1:18-cv-01340 (E.D. Va.). If he did, and proceeded to perform under the contract thereafter, then he waived the right to assert the breach and the Defendant's claim for damages sustained due to the breach, or some portion thereof, must be allowed. If the Plaintiff had no knowledge of the true labor costs prior to settlement, then the Defendant committed a material breach that induced the Plaintiff to buy a business with higher expenses - and was therefore less profitable - than the buyer anticipated. A breach by the Defendant would justify the Plaintiff's claim for damages.

The parties presented evidence through witness testimony and additional exhibits at a hearing on June 27, 2019. Final arguments were submitted by briefs following the hearing and the Court took the matter under advisement on August 9, 2019. For the reasons stated below, this Court finds the Plaintiff did not know the actual costs of labor necessary to operate the business before settlement, and that the Defendant breached the Agreement by failing to disclose those costs.

II.     FINDINGS OF FACT

Prior to settlement, the Defendant provided the Plaintiff with the 2010-2012 federal and state income tax returns for Annab, Inc. and some QuickBooks sales reports for the business.[3] Exhibit ("Ex.") 1- December 18, 2017 Trial Transcript at 84:7-87:11.

Although the total wage expenses were reported on the returns, the w-2s showing the compensation for each employee on the payroll were not attached to the returns. Tr. 66:5-7. The Plaintiff did not receive a written employee list, copies of the employee w-2s or any other information regarding the number and compensation of the individuals on the Annab, Inc. payroll prior to settlement. Tr. 66:5-22. He acquired copies of the w-2s long after purchasing the business through a subpoena of the records of Kyung Kim, the accountant hired by the Defendant to prepare those documents. The w-2s entered into evidence as Plaintiff's Exhibit 4 at the December 2017 trial confirm that in 2012, Annab, Inc. reported withholdings to the Internal Revenue Service ("IRS") for nine employees and only five employees received w-2's who were not members of the Annab family. Similarly, in 2013, the company reported withholdings for seven employees and only three of them were not members of the Annab family. Ex. 1 at 35:4-20.

---

[3] After settlement, the Defendant also provided the Plaintiff with the 2013 federal and state income tax returns for Annab, Inc.

3

The payroll costs listed on the 2010-2013 Annab. Inc. tax returns averaged between $160,000 and $180,000 annually and included wages for the owners of the business and their sons, George and David Annab. Ex. 1. 94:13-22. See also Tr. 66:8-12.

After the Plaintiff assumed control of the business, he determined that the actual weekly payroll for the staff of eleven plus four members of the Annab family was $6,160, or $320,320 annually. This amount was double the $180,000 previously reported on the Annab, Inc. tax returns given to the Plaintiff prior to settlement. Ex. 1 at 97:7-103:15. See also Tr. 64:20-65:22. The actual weekly payroll was consistent with the testimony of Mrs. Annab given on three separate occasions regarding the number of employees needed to run the business. Ex. 1 at 45:15-53:1; 223:12-224:7; 231:23-234:10. See also Tr. 27:15-35:13.

According the Mansour Annab, David and George Annab operated the Quickbooks program used to track the business' financial transactions. Ex. 1 at 191:9-13. George managed the bagel business office including data entry into Quickbooks from 2006 to 2008. Tr. 53:16-54:18. He knew the Quickbooks records for Annab, Inc. did not track payroll or other business expenses. Tr. 60:4-62:22. See also Ex. 4 – Text Messages between George Annab and George Azzouz.

David assumed the duties of office manager in 2010 and was responsible for Quickbooks data entry until 2014 when the business was sold. Ex. 1 at 197:4-20. He testified at the December 2017 trial that the software did not track business expenses. Tr. 201:5-16.

The Quickbooks records the Plaintiff received before settlement contained no information about the business payroll expenses. Ex. 1 at 144:25-145:15. The Plaintiff gained full access to the Quickbooks records on April 6, 2014 – two days after he purchased the business. Ex. 1 at 85:25-86:2. After assuming control, he discovered that Quickbooks contained no records tracking payroll expenses. Tr. 67:2-68:19.

When the Plaintiff concluded he could not resolve the discrepancies between the labor costs listed on the tax returns with his actual labor expenses, he sent a Notice of Demand for Rescission or, in the Alternative, for Termination of the Agreement to the Defendant on July 15, 2014. Ex. 1 at 123:19-124:8. When the Defendant refused to honor the demand, the Plaintiff continued to operate the business. Ex. 1 at 148:15-16.

Between April and October 2014, the Plaintiff paid the Defendant $19,590 for the lease and condo fees due on the property in accordance with his obligations under the Deed of Lease. Ex. 1 at 206:17-207:6.

The Plaintiff collected roughly $51,000 in receivables to which the Defendant was entitled, but he failed to turn over those funds to the Defendant as required under the Agreement. Ex. 1 at 135:18-136:13.

The Bank of America statements for Bagels and Beyond, LLC indicate the Plaintiff deposited a total of $540,723.49 into the business accounts according to Exhibits J-Q admitted into evidence at trial on December 18, 2017. Ex. 1 at 238:1-240:5. The Plaintiff also wrote checks to himself in the amount of $35,700 while he ran the business. Id. at 243:15-20. The aforementioned bank statements and copies of the checks entered into evidence as Defendant's Exhibit S at the December 2017 trial confirm that these checks were made payable to Khader Azzouz and that they were cashed.

III.    CONCLUSIONS OF LAW

The Plaintiff asserts he did not receive accurate information about the actual labor costs of running the bagel business prior to his purchase. He maintains the tax returns and Quickbooks records the Defendant gave him prior to settlement contained no specific information about the

5

number of employees needed to run the business or what they were paid. His oral testimony was credible and he presented documentary evidence at both trials to support his assertions that the Defendant caused the true labor costs to be underreported on its tax returns.

In her deposition in December 2016, which was read into the record at the trial in December 2017, Mrs. Annab testified that her company employed around 14 employees to run the business just prior to the sale. Ex. 1 at 228:23-234:10. The oral testimony she gave at the December 2017 and June 2019 trails was consistent with the statements made in her prior deposition. Ex. 1 at 227:16-234:10; Tr. 29:2-35:13. She also testified at both trials that she occasionally paid employees without deducting taxes from their income. Ex. 1 at 52:23-53:12 and Tr. 21:6-25.

Mrs. Annab was the sole individual responsible for submitting employee wage data to her accountant and she admitted she knew IRS regulations required her to submit withholdings data on all individuals working for the company, including part-time employees. See Ex. 1 at 60:22-61:11; Tr. 35:10-13. However, the tax documents produced by the accountant in the form of tax returns and w-2s indicate he received wage data from Ms. Annab for fewer employees than the actual number of individuals working at the company. Mrs. Annab's responses and her demeanor when being questioned in Court showed she either did not understand how to meet her obligation for reporting withholdings or that she deliberately underreported them. In any event, the result was the same. The information she gave her accountant led to the preparation and filing of tax documents that underreported the number of individuals working for Annab, Inc. Therefore, the tax documents the Plaintiff relied on to calculate labor costs prior to his purchase were inaccurate.

Although Mrs. Annab attested that she discussed the actual labor costs with the Plaintiff, she did not state that she discussed this matter with him before he signed the contract. Tr. 20:13-

19. She merely confirmed that the matter was discussed the day he took over the business – two days after the purchase. Tr. 19:9-20:19.

She also attested that the Plaintiff acquired labor cost information before signing the contract from the Quickbooks data he received directly from her sons. She insisted the software contained all of the company information on employees, tax returns, supplies, equipment and vehicle lists, and other business expenses including condo fees and utility bills. Tr. 14:12-25; 15:6-23; 18:13-19:7; 22:5-16 and 6:24-27. However, these statements were based on her assumption that labor costs were tracked in Quickbooks. In fact, she had no direct knowledge of the kind of data tracked by the software because she didn't know how to use the program. Tr. 25:22-26:9. She was completely reliant on her sons to operate Quickbooks and to deliver its data to the Plaintiff. Therefore, the Court gives no weight to her testimony that Mr. Azzouz received data on labor costs from Quickbooks records.

David's testimony at the June 2019 trial regarding the kind of data tracked in Quickbooks was dramatically different from the statements he made at the prior trial. In December 2017, he testified that the software did not track business expenses. Ex. 1 at 201:5-16. In June 2019, he changed his testimony and stated that Quickbooks tracked employee wage expenses. Tr. 46:8-16. However, he could not recall entering tax payments to the IRS more than once a year even though the company accountant testified that payroll taxes were supposed to be paid on a monthly basis. Tr. 46:9-18. Moreover, even though he insisted he was the office manager and the only employee who worked in the office, David could not explain who was on the payroll of the company just prior to the sale. For example, he did not think his mother was considered an employee of the company even though he had testified earlier that she performed the duties of "bag writer" for the business. See Tr. 49:8-10; 50:17-18. He insisted there were only two drivers for the business

7

when the overwhelming evidence indicated there were four drivers. Tr. 50-23-24; 52:10-14. He also testified that his father was not on the payroll even though his father received w-2s for the tax years 2012 and 2013. Tr. 51:15-16. David changed his testimony regarding his mother and George and later stated they were not on the payroll even though the evidence shows Mrs. Annab and George received w-2s for the tax years 2012 and 2013. Tr. 18-25. He could not explain why there were only 4 w-2's for individuals not named Annab in 2012. Id. at 56:15-17. In fact, David demonstrated he had very little knowledge about the payroll expense data he claimed he entered into Quickbooks. In short, his testimony in June 2019 was wholly inconsistent with his testimony in 2017 and contradicted the testimony of his mother and father as well as the evidence presented by the Plaintiff at both trials. Therefore, the Court gives no weight to his late attestations that the Plaintiff received Quickbooks data on the business payroll expenses prior to the sale.

There is ample evidence to support a finding that the Plaintiff received no information about the true labor costs of running the bagel business before he purchased the operation. The testimony of Samar Annab and David Annab to the contrary is simply not credible. The Court finds that Mr. Azzouz was induced to buy the business based on inaccurate information provided in the tax returns. This constituted a material breach of the contract by the Defendant that resulted in damages to the Plaintiff. Having concluded that the Defendant breached the contract, the Court will sustain the Debtor's objection to Claim 5-1 filed by Annab, Inc. in the amount of $511,656.56.

The Plaintiff originally sought damages in the amount of $90,000, however, the Defendant only received $70,000 from the buyer at settlement. The Plaintiff received the $20,000 difference as a sales commissions at closing. Ex. 1 at 140:7-24. Also, the Plaintiff concedes that the Defendant should receive a credit of $51,000 which represents the receivables Mr. Azzouz

8

collected that were never turned over to Annab, Inc. in accordance with the terms of the default provision in the Agreement. The Court agrees. This reduces his damage claim to $19,000.

The Court notes the Plaintiff also received other valuable benefits while he ran the business he later surrendered. During this period, he failed to honor his obligation to pay the Defendant $6,530 each month to cover the $5,750 in rent and $780 in condo fees he agreed to pay under the Deed of Lease executed contemporaneously with the Asset Purchase Agreement on April 4, 2014. In other words, Mr. Azzouz enjoyed the benefit of operating his business rent free for several months at the Defendant's expense. This represents a benefit the Plaintiff would not have received had the contract not been broken. The amount of rent and fees due to the Defendant but not paid was $26,120.00, which exceeds the damages of $19,000 the Plaintiff may claim. In Virginia, "[a] plaintiff is not allowed to recover for a breach of contract more than the actual loss sustained by him, nor is he allowed to be put in a better position than he would have been had the wrong not been done and the contract not been broken." *Dominion Res., Inc. v. Alstom Power, Inc.*, 297 Va. 262, 270, 825 S.E.2d 752, 756 (2019) (citing *Orebaugh v. Antonious*, 190 Va. 829, 834, 58 S.E.2d 873 (1950). The Court therefore finds that the Plaintiff is entitled to no damages under the Agreement because he received more value from the business than his $90,000 deposit was worth.

The Court will issue a separate order consistent with the findings and conclusions in this Memorandum Opinion.

Date: Oct 28 2019

/s/ Klinette H. Kindred
Klinette H. Kindred
United States Bankruptcy Judge

Entered on Docket: Oct 29 2019

**Electronic copies to**:

James P. Campbell
Justin P. Fasano
Michael Hadeed, Jr.

9